UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                CASE NUMBER 13-20568

v.                             HONORABLE GERALD E. ROSEN

D-1 DONALD CROFT,

        Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.  INTRODUCTION

On February 20, 2014, Defendant, Donald Croft, pleaded guilty to possession of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B).   Defendant entered his plea absent a Rule 11 Plea Agreement.   The government and the United States Probation Department have calculated Defendant's advisory guideline range at 210 to 262 months.  Due to the statutory maximum, Defendant's applicable advisory guideline range is 120 months.  For the reasons argued below, the government recommends a sentence of 120 months.

-1-

## II.  STATEMENT OF FACTS

On or about September 22, 2010, the National Center for Missing and Exploited Children ("NCMEC") received a complaint that Donald Croft accepted PayPal payments for pictures of minors and for soiled clothing worn by minors. The complaint provided information about a post office box in Livonia, Michigan, an e-mail address (rebscsm@gmail.com), Croft's name, and the name "Rebel Shooter."

Unrelated to NCMEC, in January of 2011, the United States Postal Inspection Service (USPIS) received a tip about a suspicious child erotica or modeling website (referred hereinafter as "Website 1") based in Livonia, Michigan. From January 2011 until April 2011, a Postal Inspector, Inspector Christopher, periodically visited Website 1.  Christopher discovered that Website 1 offered hundreds of images of minor girls for sale.  The site also sold collections of images of specific children.  The collections were referred to as galleries.  One of the children depicted in a gallery on Website 1 was "Alli."  Website 1 advertised more than 25 galleries of "Alli."  In most of these galleries, "Alli" wore makeup and was dressed and posed in a provocative manner.  One gallery for sale was entitled "Neon Alli" and contained 61 images for $45.  A sample of the "Neon Alli" gallery was displayed on Website 1.  The sample consisted of three pictures of a female child, under the age of thirteen, who appeared completely naked and

covered with neon body paint.  The profile listed her height, weight, year of birth (as 2002), bust, waist, hip, and shoe sizes.  It also listed her favorite color.

Another child depicted in a different gallery was "Nahla."  Website 1 advertised more than 15 galleries of "Nahla" and "Miss Nahla."  In most of the galleries, "Nahla" wore makeup and dressed and posed in a provocative manner.  One picture from a gallery entitled "Gallery 83" depicted "Nahla" with her back to the camera.  "Nahla's" head turned so that her face and shoulder were the focus of the camera.  "Nahla" had on a spaghetti-strapped bikini top and makeup on her face.  Gallery 83 included 62 pictures in the set.  The profile on "Miss Nahla" listed her height, weight, year of birth (as 2001), bust, waist, hip, and shoe sizes.  The profile also listed her favorite color and grade point average.  Based on his observations, Christopher determined that Website 1 warranted further investigation.

Christopher clicked on one of the galleries and was taken to a "Sponsor" page.  The page explained that "[y]ou can help support Rebel-Art in the following ways:  Purchase Rebel-Art Galleries; purchase and send new outfits to work with; sponsor a shoot; and/or purchase our used outfits and props."  A pricing table was listed with the proviso that "[w]e reserve the right to deny any sponsorship and any contribution at any time for any reason."  At the bottom of the Sponsor page was an "Order Now" tab.  Christopher clicked "Order Now" and was taken to the

"Rebel-Art Payment Center" page. Christopher was directed to send payment to "CIC" by way of the aforementioned post office box in Livonia. This page also had a link to the e-mail address "rebscsm@gmail.com."

On or about April of 2011, Website 1 became inaccessible. In August, Christopher sent a letter to CIC at the Livonia post office box. Christopher asked if there was "a new site and can I still buy pictures?" On or about August 9, 2011, Christopher received a hand written message that contained the new website (hereinafter referred to as "Website 2") and a code written out as "con code#60204JC06."

Between August 9, 2011, through February 2012, Christopher visited Website 2. Website 2, like Website 1, sold gallery sets of images of young female children. On September 30, 2011, Christopher mailed an order for three galleries with a $75 money order, payable to CIC, to the Livonia post office box. On or about October 3, 2011, he received a typed letter which requested an additional $50 and an email address. On or about October 11, 2011, Christopher sent a $50 Western Union Money Order to CIC. On or about October 27, 2011, Christopher, received a letter which indicated that his request to become a Rebel-Galleries Supporter had been denied.

Christopher contacted NCMEC for any information related to his investigation. NCMEC provided approximately ten complaints, filed between July

-4-

of 2009 and June of 2011, made against Donald Croft and/or Rebel Shooter. NCMEC also provided Affiant with a compact disc containing 2,192 images of "Alli." The "Alli" images were seized by the Federal Bureau of Investigation in two separate child pornography investigations. All of the images were of "Alli" who appeared to be under the age of 13 years. In most of the images "Alli-model.com," "Miss Alli," or "Neon Alli" were printed as an overlay on the images. The images titled "Miss Alli" and "Neon Alli" had a second overlay: "Copyright CIC P:Rebel Shooter."

Between November 18 and December 7, 2011, Christopher had another Postal Inspector, outside of Michigan, e-mail "rebscsm@gmail.com." The Inspector inquired about purchasing images from Website 2. An e-mail from "Rebel Shooter" provided instructions on how to order the images. Specifically, he was to send the order and payment to CIC at the Livonia post office box. The e-mail indicated that first time buyers were limited on what they could purchase until they were "verified." On December 13, 2011, the Inspector received a letter, with no return address, with a verification code. The inspector notified Rebel Shooter he received the verification code. Rebel shooter responded that he "received [his] sponsorship and gallery request. The requested galleries have been prepared and uploaded . . . . Thank you again for your support of our work!!!...REB." The email provided a link to a file sharing website, a username, and a password. The

inspector followed the instructions and downloaded four file folders which contained approximately 232 pictures of 3 different children.

The images from the downloaded file folders depicted girls under 13 years of age. In all of the pictures, the girls wore make-up and provocative attire. In one image "Alli" wore a white shirt, white thong underwear, and white high-heel boots. She was lying on the floor with her legs open while blowing a kiss to the camera.

On January of 2012, the Inspector placed another order for images. After following the same procedures as before, the Inspector downloaded approximately 119 pictures of "Miss Alli." In all of the pictures "Alli" is completely naked covered in body paint. In one picture "Alli" is sitting down with her legs open holding a tiger-like tail. A portion of "Alli's" genitals are exposed in the photograph.

As the investigation progressed, Website 2, the Livonia post office box, and CIC were linked to Defendant, Donald Croft. On February 21, 2012, a search warrant was executed at Defendant's residence in Livonia, Michigan. Numerous electronic storage devices and camera cards were seized. Documents containing modeling contracts and hundreds of pieces of lingerie and other erotic clothing in small child-like sizes were also seized. During the search warrant, Defendant was advised of his Constitutional Rights and agreed to an interview. Defendant admitted to taking the images downloaded by the USPIS. Defendant described the

images as art.   Defendant did not feel the clothing worn by his models were provocative since he was of the opinion that clothing was not provocative. Defendant was asked about a complaint, filed against him, for selling soiled clothing worn by underage girls.   Defendant denied that the clothing was soiled but admitted that he did try and sell the used clothing worn by all his models.

The defendant told Christopher that he currently had models as young as four and as old as thirty-four years-old.   Defendant indicated that he never photographed children under the age of 18 without the presence of a parent. Moreover, according to Defendant, for all of the models under eighteen, their parents signed modeling contracts on their behalf.   Defendant explained that he photographed his models at his residence, a farm, a castle, the Embassy Suites, and at Belle Isle.   Defendant denied photographing underage models nude.   Regarding the photographs of "Miss Alli" nude with body paint, he stated he did not apply the paint and did not consider her nude.

The defendant denied having child pornography on his computers or computer storage devices.   He admitted he saw things before that were much worse than what he produced.   He also informed Inspector Christopher that he alone had access to his computers or computer storage devices.   Upon further questioning, Defendant confirmed that his daughter was a model featured on his website, that she was under 18 years of age, and that her mother was not aware she was a model

or featured on his website.  The defendant was asked about a book about sex trafficking which was found in the basement.  He stated he purchased it from a bookstore because he thought it might be interesting.

A computer forensic examination was conducted on Defendant's computers, computer storage devices, and camera cards.  The certified computer forensic examiner found child erotica and child pornography.  Some of the child pornography was downloaded from the Internet and others were produced by Defendant.  Some of the child pornography he downloaded depicted children, as young as three or four years-old, performing oral sex on adult males.  Another image depicted a young child with what appeared to be seaman spread across her chest.  One image depicted an eleven or twelve year-old who was spreading her legs and exposing her vagina.  The examiner found a deleted image of an adult male performing oral sex on a two year-old girl.  Other images depicted naked children exposing their genital or pubic area.  One such child was no older than two.  Additionally, Defendant had over 350 thumbnails of child pornography. When a user opens an image, a thumbnail of that image is automatically created by the operating system.  Consequently, every thumbnail of an image on a computer is evidence that the image was opened by a user.

The examiner also found a substantial amount of images that depicted "Nahla" and "Alli."  Several pictures depicted "Nahla" lying on a bed wearing

-8-

white, see-through, fish-net lingerie.  In one image, her leg is extended into the air.  She is not wearing any undergarments and her naked genitals are completely exposed and visible to the camera.  In other images, she was wearing see-through outfits, thong underwear, no underwear, and/or no shirt which exposed her breasts.  In many of the images, "Nahla" is posed in a very provocative manner.  "Nahla's" mother, Defendant Four, was shown several of the images seized from Defendant's home.  Defendant Four indicated that, in some of the images, her daughter was approximately five or six years-old.  Defendant Four indicated that Defendant was the only photographer her daughter ever modeled for.

The "Alli" pictures found in Defendant's home depicted "Alli" topless or wearing thong underwear, in the shower wearing a wet see-through pull-over, naked covered in body paint, or a sadistic or masochistic outfit with fishnet stockings.  The images are clearly sexual in nature and undoubtedly designed to arouse individuals who are attracted to such images.  Other images of a child referred to as "Bonita," show a young girl wearing a see through top and a string bikini.  In one picture "Bonita" is posed with her back on the ground so that her vaginal area is the central focus of the image.  "Bonita" is also seen wearing the same sadistic or masochistic outfit "Alli" wore in other images.  In another image, a child is on a couch with her knees up to her chest.  She is wearing a purple see through top and no underwear.  Because her knees are pulled to her chest and she

has no underwear on, her genital and pubic area is visible.  Two separate pictures shows "Kimmy," a minor, wearing see-through fishnet tops and bottoms. "Kimmy's" vagina is clearly visible in both pictures.

Several pictures of "Belle" were also seized.  "Belle" is the daughter of Defendant 5.  In the pictures "Belle" wore a top, no pants, and black boots that went up to her knees.  The top only went as far as her waist, stopping above her genital area.  She wore a black see-through thong.  In some of the images, the thong does not cover "Belle's" vaginal region.  In one picture, "Belle's" legs are spread open and her fingers are touching the top of her vaginal area.  In the "Belle" pictures, the focal point of the images is her vaginal region.  Defendant 5 told Inspector Christopher that "Belle" was just shy of her fourth birthday when the pictures were taken.

The investigation revealed that Defendant and the mothers of his "models" picked out the outfits the children wore.  Defendant would suggest certain outfits and the mother's would agree or find another.  One of Defendant's underage models "Kimmy," indicated that she often did not like the clothing Defendant had her wear because the clothing showed her private parts.  When "Kimmy" first met Defendant, she described him as nice.  She indicated that he acted like an "asshole" when she refused to wear some of the outfits he picked out for her.

-10-

The father of a "model" told the USPIS that Defendant stated his website was used by talent scouts looking for new models.  The father felt Defendant's representations were untrue.  "Nahlah's" mother indicated that Defendant was supposed to delete pictures that captured her child's breasts or vagina.  All the parents or guardians admitted that they were paid for allowing Defendant to photograph the children and post the images on his website.

### III.  ADVISORY GUIDELINES

The government and the United States Probation Department have calculated an advisory guideline range of 210 to 262 months, capped at the statutory maximum of 120 months.  The calculation is based, in part, on the applicability of USSG §2G2.2(c)(1) which states, in part:

> If the offense involved causing, transporting, permitting, . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct . . . apply §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

The application note states that "the cross reference . . . is to be construed broadly and includes all instances where the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, . . . a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct."  USSG §2G2.2(c)(1) cmt. n. 5.  (emphasis added).

-11-

In *United States v. Martin*, 291 F. App'x 765, 766 (6th Cir. 2008), the defendant owned and operated a business offering modeling courses, instruction, and photography services. The defendant used this business to produce child pornography. *Id.* The defendant pleaded guilty to one count of production of child pornography and one count of possession of child pornography. *Id.* at 769. As to the possession count, the lower court cited the cross reference: "If the offense involved causing . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1 . . . ." *Id.* at 770. n.9. The appellate court found that, for the possession count, "the district court properly applied the cross-reference of USSG §2G2.2(c)(1) to calculate the offense under the production guideline (USSG §2G2.1), rather than the possession guideline (USSG §2G2.2)." *Id.* at 769-70.

In *United States v. Dawn*, 129 F.3d 878, 879 (7th Cir. 1997), the defendant pleaded guilty to receiving and possessing child pornography. Defendant had made the child pornographic films at issue outside of the United States. *Id.* The lower court applied the cross-reference in USSG §2G2.2(c)(1). Upon review, the appellate court ruled that "[t]he cross-reference merely implements the common sense notion that a receiver or possessor who has manufactured the pornography in his possession is both more culpable and more dangerous than one who has received or possessed the pornography and no more." *Id.* at 884. Dawn's creation

of the films was "relevant because it sheds light on the gravity of his conduct as a receiver and possessor of the films." *Id*. 884-85. "Because Dawn produced the child pornography that he pled guilty to receiving and possessing, the Sentencing Guidelines required that he be sentenced using the production guideline." *Id*. 885-86. Consequently, the court affirmed the lower courts application of the USSG §2G2.2(c)(1) cross reference.

In *United States v. Shuler*, 598 F.3d 444, 445-46 (8th Cir. 2009), one of the defendants, Fiorella, pleaded guilty to three counts of possession of child pornography. The appellate court found that it was "undisputed that Fiorella encouraged her daughter to take nude photographs and later uploaded them onto a computer." *Id*. at 448. In calculating Fiorella's guidelines, the court found that the use of the cross-reference in USSG §2G2.2(c)(1) was appropriate. The court ruled that the evidence that Fiorella "enticed [a juvenile] to produce child pornography" was "clearly sufficient to support the district court's decision to apply the cross reference in §2G2.2(c)(1)." For support, the Shuler court cited *United States v. Starr*, 533 F.3d 985 (8th Cir. 2008).

In *Starr*, the defendant was convicted of sexual exploitation of a minor, receiving child pornography, attempted sexual exploitation of a child, and possession of child pornography. *Id*. at 992-993. The court found that "the PSR recommended the application of the cross reference to USSG §2G2.1 because Starr

caused the production of the illegal material." *Id.* at 1001.   In affirming the application of the cross-reference, the court held that "the evidence was sufficient for the district court to find that Starr caused the production of sexually explicit images of a minor." *Id.*

In *United States v. Whitesell*, 314 F.3d 1251 (11th Cir. 2002), a minor had engaged in "internet chat session[s] with Whitesell . . . .   [O]n several occasions, Whitesell directed her to provide him with pictures and videos of her masturbating." *Id.* at 1252-53.   The sexually explicit images and videos were found on the victim's computer. *Id.* at 1252.   Whitesell was indicted and pleaded guilty to possession of child pornography. *Id.* at 1252.   The lower court found that the defendant "knew the victim was a minor when he induced her to photograph and videotape herself engaging in sexually explicit conduct . . . ." *Id.* at 1255.   The appellate court ruled that Whitesell "actually caused the victim to create the child pornography that he possessed, thereby implicating §2G2.1.   [Thus], the district court's application of . . . [the] cross-reference to §2G2.1 was not erroneous . . . ." *Id.* at 1256.

In *United States v. Stoterau*, 524 F.3d 988, 995 (9th Cir. 2008), the defendant pleaded guilty to transporting child pornography.   The court affirmed the application of the "cross-reference to USSG §2G2.1 (sexually exploiting a minor by production of sexually explicit material) pursuant to USSG §2G2.2(c) because

-14-

Stoterau's offense conduct involved posing and photographing Doe as he engaged in sexually explicit conduct . . . ." *Id*. at 996.

The cross-reference in USSG §2G2.2(c)(1) can also apply to individuals who never actually produced child pornography. In *United States v. Garcia*, 411 F.3d 1173, 1178 (10th Cir. 2005), the defendant attempted to persuade an undercover officer, posing as a minor, "to engage in sexual activity with her two daughters and to photograph the event." Garcia argued that his offense of conviction, interstate distribution of child pornography, "did not 'involve' the behavior listed in the cross-reference." *Id*. at 1177. The court ruled that "[t]he conduct the guideline seeks to punish is not only the actual production of child pornography, but the active solicitation for the production of such images." *Id*. at 1179. Garcia had offered to send Polaroid film to the undercover so "she" could take pictures of her and her daughters "nude doing things to each other . . . ." *Id*. Citing the application note, that the cross-reference "is to be construed broadly," the court found that "[a] defendant's conduct may be one step removed from the actual production and still fall within the ambit of the cross-reference." *Id*.

Based on the language in USSG §2G2.2(c)(1), the application note, and the above cases, the government argues that the cross reference applies in the calculation of Defendant's advisory guideline range. Without question, the Defendant produced child pornography. In the context of the cross reference, he

-15-

caused and permitted a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. More specifically, he caused and permitted a minor to engage in the lascivious display of their genital or pubic area in order to create a visual depiction of their genital or pubic area. Pursuant to the cross reference, the fact that he pleaded to possession of child pornography does not negate the scoring of the production guidelines in USSG §2G2.1.

## IV.  SENTENCING FACTORS, TITLE 18 U.S.C. § 3553

A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE AND HISTORY AND CHARACTERISTICS OF THE DEFENDANT, 18 U.S.C. § 3553(a)(1).

1.    <u>Nature and circumstances of the offense.</u>

Defendant put very young children in outfits befit for adult pornography stars. Many of the outfits were highly inappropriate and exceedingly revealing. In numerous photographs the child was clearly not wearing underwear. While wearing these outfits, the children were photographed in varying poses, some benign and some extremely sexualized. Defendant also produced images where a child was naked and covered in paint. The paint, at times, only marginally covered up the child's genital and pubic area. In other pictures, Defendant photographed a child naked, in a bathtub, partially covered with bubbles. In another, a child is in the shower wearing a cover that, when wet, became totally transparent. In yet

another, a child appears to have very little clothing on while she poured water over her body from a hose. Defendant's images prove that he was in the business of producing and selling child erotica. While photographing the child erotica, the combination of the revealing outfits, lack of underwear, and provocative poses also resulted in the creation of child pornography.

Based on the obscene outfits and lascivious poses, the child pornography was an inevitable byproduct of the child erotica. Defendant cannot claim that the child pornography happened unexpectedly or through carelessness. Several of the outfits he selected for his "models" to wear all but guaranteed that he was going to capture their vaginal region in a lascivious manner. Many of Defendant's galleries start with poses where the child's genital or pubic area is out of sight. As the photographs progress, the child's poses become more sexualized and, in some galleries, leads to the lascivious display of their genital area. The order of the images in some of the galleries suggest that Defendant deliberately started off photographing child erotica but, as the pictures continued and the child became more comfortable, relaxed, and/or involved, the images became more sexualized. In some galleries, Defendant appears to have had a specific objective; to ultimately photograph the child's vaginal or pubic area. Although he did not distribute or sell this child pornography, he also did not delete them.

In addition to child erotica and child pornography Defendant created, Defendant possessed child pornographic images that were downloaded from the Internet. The majority of these images were graphic images which depicted children engaged in oral sex, sexual acts with other children, and the lascivious display of the child's genital or pubic area. In his interview, Defendant told Inspector Christopher that he was the only person with access to his computers. Consequently, the downloaded child pornography is directly attributable to Defendant. Moreover, the computer forensic examiner found too many images of downloaded or viewed child pornography for Defendant to claim that they inadvertently ended up on his computer.

2.    History and characteristics of the defendant.

The PSR reflects that Defendant reported no history of mental or emotional health problems or treatment.

B.    THE SENTENCE IMPOSED MUST REFLECT THE SERIOUSNESS OF THE OFFENSE, 18 U.S.C. §3553(a)(2)(A).

Defendant's conduct in this case was predatory and exploitive in nature. Defendant sought out mothers who were willing to let him dress their daughters in the obscene outfits he wanted to photograph them in. He sought out and paid the mothers (all of which appeared to have financial hardships), called their children "models," told them they were beautiful, than sold their images to perverts on the Internet. The mothers he recruited had one of two mindsets. Either they

-18-

knowingly let Defendant take the pictures for money or they fooled themselves into thinking that "modeling" for Defendant was something other than selling dirty pictures of their young children. None of them mothers came to Defendant with the intention of creating child erotica or child pornography with their daughters. It was only after Defendant signed the children as "models" that the skimpy and the see-through outfits came out. Defendant could identify which mothers were willing enough, ignorant enough, or desperate enough to allow him to take highly sexualized pictures of their child. Once they were identified, Defendant, along with the mother, exploited that child.

Defendant also knew his target customer base and that these children were the product they were looking for. Defendant's customer base included, but was not limited to, individuals who wanted highly sexualized images of little children. No other consumer would have an interest in these types of images. In order to purchase the images, Inspector Christopher had to jump through several hoops only to get denied for no apparent reason. A more legitimate photographer, who was not trying to shield his images from law enforcement, would have his images more readily available. Clearly, Defendant knew what he was doing, knew who his customers were, and wanted to avoid law enforcement.

Although the majority of the images Defendant created were not legally child pornography, they came very close. There are times when the line between

child erotica and child pornography, between legal and illegal images, is unclear. Many of Defendant's child erotica images went right up to that line while other images patently crossed it.   Nevertheless, some of Defendant's images were sexualized enough for individuals who collected child pornography.  Based on the information provided by NCMEC, 2,192 images of "Alli" were found by the FBI in two child pornography investigation.  "Alli" and other children that "modeled" for Defendant will unfortunately, when they get older, learn that highly sexualized images of themselves as young children are forever on the Internet for anyone to download and see.

Defendant also had images of child pornography he downloaded from the Internet.  These images depicted children being sexually abused and exploited. The computer forensic examiner found approximately 350 thumbnail images of child pornography.  This indicates that Defendant, at the very least, viewed those 350 images, as each thumbnail represents an image that was opened on his computer.  As if the images he created were not enough evidence, the presence of downloaded child pornography by Defendant demonstrates that he has a sexual interest in young children.   This attraction to young children, along with Defendant's criminal and objectionable conduct discussed above, proves that Defendant is a predatory and dangerous.

C.   THE SENTENCE IMPOSED MUST AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, AND PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT, 18 §§ 3553(a)(2)(A), (B) AND (C).

A sentence of 120 months will provide adequate deterrence and protect the public. Such a sentence is necessary considering the criminal conduct in this case and the fact that this is not Defendant's first contact with the law related to child exploitive behavior. The PSR, at ¶ 62, indicates that in 2006, Defendant was charged with eleven counts of possession of child sexually abusive material. According to police reports, media seized from his home contained numerous images and videos of child pornography. The evidence was ultimately suppressed which led to dismissal of the charges. Defendant's brush with the law appears to have had no deterrence on his behavior. Years later, Defendant continues to download child pornography. Now, however, he also produces child erotica, creates child pornography, and sells his child erotica online. The dismissal of Defendant's Kalamazoo charge appears to have emboldened him more than it has deterred him.

Defendant is a danger to children. Defendant's background shows that he has had a sexual attraction to children since as early as 2006. In the instant case, Defendant used his skill set as a photographer as a way of actively seeking and gaining access to children and making money off of them. Defendant's history and

culpability in this case necessitates a sentence of 120 months.  A sentence of 120 months will not only adequately punish and deter Defendant but it will also protect the public.

D.    AVOIDING UNWARRANTED SENTENCE DISPARITIES AMOUNG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT, 18 U.S.C. §3553(A)(6).

The Court has an obligation to ensure minimal sentence disparities among defendants with similar records that have been found guilty of similar conduct.  A sentence of 120 months is well below the advisory guideline range and will not create a significant disparity between similarly situated defendants.

## V.  CONCLUSION

The government moves this Honorable Court to sentence Defendant to a 120 month term of incarceration with the United States Bureau of Prisons for the reasons discussed above.

Respectfully submitted,
BARBARA L. MCQUADE
UNITED STATES ATTORNEY

s/Matthew A. Roth
Matthew A. Roth
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Phone:  313-226-9186
Dated: June 25, 2014                    E-Mail:  matthew.roth2@usdoj.gov